| | | |
|---|---|---|
| CHRIS DITTON, in his individual capacity and his capacity as Assessor of Avon Township, CYNTHIA L. BRUST, and RICHARD M. WATTS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 14 C 3260 |
| | ) | Judge John Z. Lee |
| LISA RUSCH, in her individual capacity and her capacity as Supervisor of Avon Township, CATHY DEGROH, CHRIS LARSON, WILLIAM MCNEILL, LISA DELAMAR, AVON TOWNSHIP, and THE AVON TOWNSHIP BOARD OF TRUSTEES, | ) ) ) ) ) ) | Magistrate Judge Mason |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Chris Ditton is the Assessor of Avon Township, Illinois. Plaintiffs Cynthia L. Brust and Richard M. Watts are employees of the Assessor's Office. Ditton, Brust, and Watts filed this lawsuit against Avon Township, Lisa Rusch, who is the current Supervisor of Avon Township, the Avon Township Board of Trustees, and individual Avon Township Trustees, Cathy DeGroh, Chris Larson, William McNeill, and Lisa DeLaMar (collectively "Defendants"), claiming that the Defendants violated Plaintiffs' constitutional rights by impermissibly retaliating against Plaintiffs for opposing the individual Defendants in prior Township elections. According to Plaintiffs, Defendants did so by adopting a 2014 budget for the Assessor's Office that would force the Office to institute employee layoffs and cut benefits. Plaintiffs now ask the Court to preliminarily enjoin the Avon Township Board of Trustees from enacting the 2014 budget. As set forth below, the Court concludes that Plaintiffs have not met their burden of establishing that injunctive relief is warranted, and Plaintiffs' motion is therefore denied.

# Factual Background[1]

Plaintiff Chris Ditton ("Ditton") is the Assessor of Avon Township.  Ditton Decl. ¶ 1.  In 2009, Ditton ran for the Board of Trustees of Avon Township as part of a slate called "Avon Forward," which ran on a platform of cutting property taxes and delivering more efficient services.  *Id.* ¶ 4.  Plaintiff Cynthia Brust ("Brust"), an employee of the Assessor's Office, also supported the "Avon Forward" slate, of which her husband Tom was a member.  Brust Decl. ¶¶ 1, 3.

Defendant and current Avon Township Trustee, William McNeill ("McNeill"), and the mother of Defendant Chris Larson ("Larson"), another current Trustee, ran for office on an opposing slate.  Ditton Decl. ¶ 4.  Although Ditton was not elected Trustee, in December 2011, the Trustees appointed him to the position of Avon Township Assessor.  *Id.* ¶ 15.  McNeill was the only Trustee to vote against Ditton's appointment.  *Id.* ¶ 6.

Four years later, in 2013, many of the "Avon Forward" participants ran for office as part of the same slate, renamed "Avon Action."  *Id.* ¶ 7.  The "Avon Action" slate included Ditton, Tom Brust, Larson, Defendant Lisa Rusch ("Rusch"), and Defendant Lisa DeLaMar ("DeLaMar").  *Id.*  Brust and Plaintiff Richard Watts ("Watts") actively campaigned on behalf of the "Avon Action" candidates.  Brust Decl. ¶ 5; Watts Decl. ¶ 4.  The campaign was marked by discord, and Larson withdrew from "Avon Action" before the campaign ended.  Ditton Decl. ¶ 8.

The "Avon Action" slate was opposed by candidates from another slate, "Avon Strong," which included McNeill and Defendant Cathy DeGroh ("DeGroh").  *Id.*  Ultimately, Ditton was

---

[1]    The following facts are taken from Plaintiffs' Complaint and the exhibits thereto, as well as the briefs and exhibits in support of and in opposition to Plaintiffs' motion for preliminary injunction. Disputed facts are so noted.

elected Assessor, Rusch was elected Supervisor, and McNeill, Larson, DeLaMar, and DeGroh all were elected to the Board of Trustees. *Id.* ¶ 1; Rusch Dep. 4:16-20; Compl. ¶ 52.

Plaintiffs allege that after taking office in 2013, Rusch was the subject of continued harassment by DeGroh, McNeill, Larson, and David McArtin, a Township employee who had supported another candidate for Rusch's position. At a certain point, however, DeGroh, McNeill, Larson, and McArtin redirected their animus away from Rusch and towards Ditton. Brust Decl. ¶ 7.

When Ditton took office, he had two full-time employees and one part-time employee. Ditton Dep. at 91-92. Soon after taking office, Ditton hired Brust and Watts to fulfill what he perceived as critical staffing needs. Ditton Decl. ¶¶ 15-18. However, at the time he took office, Ditton never complained about the amount of work at the Assessor's Office, nor did it appear that the work was being handled in an insufficient manner. Ditton Dep. at 82-83; Ex. 1A, Dkt. 11 at 5. Defendants assert that most, if not all, of the current Assessor's Office employees also have second jobs, in addition to their full-time positions at the Assessor's Office. Dkt. 25, Defs.' Supp. Resp., DeGroh Aff. at 2; McNeill Aff. at 4-5; Rusch Aff. at 4-5.

In December 2013, Ditton presented his proposed 2014 budget to the Board of Trustees. Ditton Decl. ¶ 20. Ditton asserts that the budget was identical to the one approved in the prior year, which was already "bare bones." *Id.* ¶¶ 19-20. Ditton claims that he heard "rumblings from people in his office that the Board was looking to cut his budget as political retribution." *Id.* ¶ 20. As a result, he held numerous meetings with certain Trustees to negotiate the scope of his budget and agreed to several minor reductions in his proposed budget. *Id.* ¶ 21. Ditton claims the Trustees led him to believe that the budget would be passed substantially as proposed, and that at no time did any of the Trustees mention to him that Avon Township was experiencing

a "fiscal crisis." *Id.* But on March 9, 2014, Larson and Rusch informed Ditton that the budget for the Assessor's Office that the Board would approve would be considerably less than the one Ditton had proposed. *Id.* ¶ 22.

On March 10, 2014, the Township held its formal budget meeting. *Id.* Ditton attended the meeting and presented his case as to why his proposed budget should be adopted. *Id.* Ditton alleges that at the meeting Trustee Larson claimed the Township was experiencing a "financial crisis" and blamed it on the prior Board (of which Ditton was a member). Ditton also claims that Larson displayed overt animus toward Ditton and his office. *Id.*

The Board rejected Ditton's arguments and preliminarily adopted the Board's proposed budget without alteration. Larson Aff. at 6. It is also undisputed that, although the budget was not formally adopted until May 12, Ditton did not provide the Board with any additional information as to why the Assessor's Office needed more funding, nor did he seek to reopen budget discussions with the Board. Dkt. 17, Ex. 2, McArtin Dep. at 90 and 119; Ex. 1, Ditton Dep. at 70-71; Dkt. 25, Defs.' Supp. Resp., DeLaMar Aff. at 3-4; Larson Aff. at 6-7.

As compared to the budget proposed by Ditton, the 2014 budget reduced funding for employee salaries at the Assessor's Office by approximately 30%. Rusch Aff. at 5. In effect, the 2014 budget reduced the four full-time equivalent ("FTE") positions currently employed at the Assessor's Office to two-and-two-thirds FTE positions. Larson Aff. at 5. When making these cuts, the Board took into consideration the number of hours that the current Assessor's Office employees were spending on secondary jobs to determine the amount of time not presently being spent working for the Township. Rusch Aff. at 5. Indeed, Ditton acknowledged that two of his employees also worked as real estate agents and that another employee drove a school bus part-time. Ditton Dep. at 31-32. In addition, he conceded that all of his employees, himself included,

work less than forty hours per week and that he never tracked the time his employees spend at the office, although he could do so.  Ditton Dep. at 30-31.  It also is undisputed that Ditton has the complete discretion to use the funds provided by the 2014 budget as he sees fit in order to perform the duties of his office, including the hiring and firing of staff.  *Id.*; Ditton Dep. at 72; *see* 35 Ill. Comp. Stat. 200/2-65; 60 Ill. Comp. Stat 1/500(a).

As for the Township's financial condition, Defendants' witnesses testified that the previous Township Board had reduced the tax levy by 27%, forcing the present Board to draw $161,000.00 from the Township's reserves and implement significant, across-the-board budget cuts that impacted all aspects of the Township's operations.  Defs.' Resp. to Mot. for Prelim. Inj., Ex. 2, McArtin Dep. at 90.  Plaintiffs counter that, in April 2014, the County Clerk informed the Township that the actual tax revenue would be higher than projected.  Dkt. 11 at 9.  Plaintiffs further contend that the Township's current reserves are in excess of $1,000,000.00.  Compl. ¶¶ 19, 47.

## Legal Standard

Plaintiffs ask the Court to enjoin Avon Township from enforcing the final 2014 budget as enacted.  "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc.,* 549 F.3d 1079, 1085 (7th Cir. 2008) (internal citations and quotations omitted).  The moving party must make a clear showing that it is entitled to the relief it seeks.  *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005).  To determine whether a preliminary injunction is warranted, the Court engages in a two-phase analysis:  a threshold phase and a balancing phase.  *See Girl Scouts,* 549 F.3d at 1085–86.

"To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements." *Id.* at 1086. First, the party must show that it will suffer irreparable harm without the injunction. Second, the party must demonstrate that traditional legal remedies would be inadequate. Third, the party must establish that its claim has some likelihood of succeeding on the merits. If the party cannot make a showing as to *each* of these threshold requirements, the preliminary injunction must be denied. *Id.* If, however, the party meets this initial threshold, the Court will proceed to the balancing phase of the analysis. *Id.*

In the balancing phase, the party seeking the injunction must demonstrate that its harm in the absence of such relief outweighs any harm that may be suffered by the non-moving party if the injunction is granted. *Id.* In making this determination, the Court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984)). Additionally, where appropriate, this balancing process "should . . . encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest")." *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). Taking into account all of these considerations, the Court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.* (internal citations and quotations omitted).

**Analysis**

## I. Irreparable Harm/Adequate Remedy at Law

The first threshold requirement is a demonstration that Plaintiffs will suffer irreparable harm in the absence of the relief sought. *Girl Scouts*, 549 F.3d at 1087. To establish irreparable

harm, Plaintiffs must show "that irreparable injury is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The threat of irreparable injury necessary to justify the extraordinary remedy of preliminary injunctive relief must be "real," "substantial," and "immediate," not speculative or conjectural. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Thus, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 22 (7th Cir. 1992).

The second threshold requirement Plaintiffs must satisfy to obtain preliminary injunctive relief is to demonstrate that traditional legal remedies would be inadequate to remedy their harm. *Girl Scouts*, 549 F.3d at 1095. A damages remedy need be "seriously deficient," but not "wholly ineffectual." *Id.* (quoting *Roland Mach.*, 749 F.2d at 386). As the Seventh Circuit has long recognized, the inadequacy of legal remedy analysis often overlaps with the irreparable harm analysis. *See*, *e.g.*, *Roland Mach.*, 749 F.2d at 383; *see also Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997) ("An injury is 'irreparable' when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard."). Here, Plaintiffs largely rely upon the same arguments to establish both requirements. The Court therefore considers the two elements in tandem.

To support their motion, Plaintiffs contend that they would suffer irreparable harm in numerous ways. *First*, they claim that, as a result of the 2014 budget, Brust and Watts will be irreparably harmed by the loss of their jobs and benefits, and Ditton will be irreparably harmed by the loss of some of his benefits. *Second*, Plaintiffs assert that Ditton will be irreparably

harmed, because the budget would make it more difficult—if not, as he alleges, impossible—for him to do the job he was elected to perform. *Third*, Ditton alleges that he will suffer irreparable harm, because his reputation would be damaged if he is unable to perform his work in a satisfactory manner, making it more difficult for him to be reelected in the future. *Fourth*, Plaintiffs fear that the citizens of Avon Township will be irreparably harmed because there is the potential that they will not receive adequate assessment services, resulting in taxing inequities. And *fifth*, Plaintiffs argue that irreparable harm should be presumed because they are claiming a violation of their constitutional rights. Plaintiffs contend that all of these harms cannot be adequately remedied through monetary damages. There are numerous problems with all of these arguments.

As an initial matter, the loss of a job or the benefits associated with a job generally does not constitute irreparable harm. *See*, *e.g.*, *Bedrossian v. Northwestern Mem'l Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005). As the Seventh Circuit explained in *Bedrossian*, the United States "Supreme Court set a high standard for obtaining preliminary injunctions restraining termination of employment. . . ." *Id.* (citing *Sampson v. Murray*, 415 U.S. 61, 92 (1974)). The Court emphasized that "although it did not 'foreclose[ ] relief in the genuinely extraordinary situation,' the type of irreparable injury required must really depart from the harms common to most discharged employees." *Id.* (quoting *Sampson*, 415 U.S.at 92 & n. 68). Because Bedrossian's claimed injuries, which he claimed to be humiliation, reputational damage, and loss of income, "did not rise to the level of an extraordinary termination of employment situation," the Seventh Circuit found that irreparable harm did not exist. *Id.* at 845-46 (citing *Sampson*, 415 U.S. at 92); *see also Peck v. Montefiore Med. Ctr.*, --- F. Supp. 2d ---, No. 13 Civ. 8442, 2013 WL 6620980, at *6 (S.D.N.Y. Dec. 16, 2013) ("The law is clear that a discharge from employment and the

injuries may flow therefrom (*e.g.*, lost income, damage to reputation, and difficulty finding future employment) do not constitute the irreparable harm necessary to obtain a preliminary injunction.").

Here, the harms upon which Plaintiffs rely are those that typically flow from a discharge from employment and do not support the need for preliminary injunctive relief. Additionally, it is undisputed that (1) the 2014 budget allows Ditton to maintain a number of employees, *see* Larson Aff. at 5, and (2) Ditton has the statutory discretion to keep or fire Brust and Watts as employees so long as he remains within the 2014 budget. *See* 35 Ill. Comp. Stat. 200/2-65; 60 Ill. Comp. Stat 1/500(a).[2] It also is undisputed that Ditton has the statutory discretion to maintain the full extent of his benefits, if he so desires, within the 2014 budget. *Id.* The mere possibilities that Brust and Watts *could* lose their jobs and that Ditton's benefits *may* be reduced are simply too speculative and conjectural to entitle them to injunctive relief on this basis. *See Lyons*, 461 U.S. at 111; *Abbott Labs.*, 971 F.2d at 22. As such, Plaintiffs' first argument is unavailing.

Ditton's contention that the 2014 budget will cause him irreparable harm by impeding his abilities to perform his duties (and thereby hurting his future electability) fails for similar reasons. First, Ditton provides no case law in support of these contentions, and the Court has found none. Rather, as discussed above, damage to reputation generally does not constitute irreparable harm in the employment context. *See*, *e.g.*, *Bedrossian*, 409 F.3d at 845; *Peck*, 2013 WL 6620980, at *6. Moreover, a plaintiff claiming reputational harm still must demonstrate that such harm is more than merely speculative. The case of *Brown v. District of Columbia*, 888 F. Supp. 2d 28 (D.D.C. 2012), is instructive. In denying a professor's motion for preliminary

---

[2] In fact, it is undisputed that, rather than terminating Brust's and Watts' positions, Ditton has the necessary funds under the 2014 budget to keep them employed, so long as he eliminates other positions now staffed by other personnel. Ditton Dep. at 72; Larson Aff. at 5.

injunction to prevent her university from terminating her employment and denying her tenure, the court held that she could not demonstrate irreparable harm because she failed to "introduce evidence into the record that would allow this Court to determine whether plaintiff faces irreparable harm to her professional reputation or teaching career if an injunction is not issued." The professor's "speculative, unsubstantiated contentions" of a tarnished professional reputation and risk of being unable to obtain a different academic position were insufficient to warrant injunctive relief. *Id.* at 33. Similarly, here, Ditton offers no evidence that his feared scenario is imminent or likely to occur.

Taking another tack, Ditton also argues that the 2014 budget will irreparably harm the citizens of Avon Township, because they will not receive adequate assessment services. But, again, the evidence in the record falls short of substantiating this claim, rendering them too speculative to establish irreparable harm.[3] *See, e.g.*, *Swan v. Bd. of Educ. of the City of Chi.*, Nos. 13 C 3623, 13 C 3624, 2013 WL 4401439, at \*27 (N.D. Ill. Aug. 15, 2013) (rejecting school closing opponents' irreparable harm arguments for failure to establish that the harm would be "real," "substantial," and "immediate") (citing *Lyons*, 461 U.S. at 111); *Lyon v. Ill. High Sch. Ass'n*, No. 13 C 173, 2013 WL 309205, at \*5 (N.D. Ill. Jan. 25, 2013) (rejecting claim by plaintiff that preventing him from wrestling at a state tournament would cause irreparable harm because he could lose a college scholarship or be unable to attend the college of his choice as "speculative"). Indeed, any future damage that a particular homeowner might suffer as a result of an incorrect or outdated property assessment would likely be quantifiable and adequately remedied by monetary damages. *See Pelfresne v. Vill. of Lindenhurst*, No. 03 C 6905, 2004 WL 1660812, at \*9 (N.D. Ill. July 23, 2004) ("Plaintiff cites no cases, and the court

---

[3]     In any event, it is not at all clear that Ditton would have standing to pursue a claim seeking to remedy an injury on behalf of Avon Township homeowners, and Plaintiffs have provided no legal authority to support their theory.

found none, indicating that either a decrease in property value or a real property owner's claim that he will be unable to develop his property at an unspecified future time constitute irreparable injuries which money cannot adequately remedy").  Therefore, Ditton's assertions of irreparable harm to Avon Township homeowners are unpersuasive.

Finally, Plaintiffs argue that they would be irreparably harmed and lack an adequate remedy at law because the loss of First Amendment freedoms at the hands of Defendants can never be redressed.  However, injury to constitutional rights does not *a priori* entitle a party to a finding of irreparable harm.  *See*, *e.g.*, *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction"); *Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162-63 (C.D. Ill. 1997) (collecting cases).  What is more, in those cases where courts have found irreparable harm stemming from constitutional harm, the constitutional violations were ongoing.  *See*, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (political speech presently being chilled); *National People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (same).[4]  Here, there is no evidence that Plaintiffs' political speech currently is being chilled by Defendants' alleged conduct.

For the foregoing reasons, the Court finds that Plaintiffs have failed to satisfy their burden to establish irreparable harm or the unavailability of an adequate remedy at law.

## II.    Likelihood of Success on the Merits

---

[4]    Plaintiffs' citations to *Elrod*, 427 U.S. at 374, and *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir. 1987), also are distinguishable for a separate reason.  In those cases, the courts held that the district courts had not abused their discretion in finding irreparable harm where the courts also found a likelihood of success on the merits.  *Elrod*, 427 U.S. at 374; *Romero Feliciano*, 836 F.2d at 4.  Here, as set forth below, Plaintiffs have not established a likelihood of success on the merits as to their First Amendment retaliation claims.

Because Plaintiffs cannot demonstrate irreparable harm or that they lack an adequate remedy at law, the preliminary injunction must be denied. *Cox v. City of Chi.*, 868 F.2d 217, 223 (7th Cir. 1989) ("If a plaintiff fails to meet just one of the prerequisites for a preliminary injunction, the injunction must be denied."). However, in the interest of completeness, the Court will also address the remaining elements, starting with whether Plaintiffs have demonstrated a likelihood of success on the merits. *See Girl Scouts*, 549 F.3d at 1096.

The threshold for establishing likelihood of success is relatively low. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011). The moving party must only "present a claim plausible enough that (if the other preliminary injunction factors cut in their favor), the entry of a preliminary injunction would be an appropriate step." *Id.* at 783.

### A. First Amendment Retaliation

To establish a *prima facie* case of First Amendment retaliation, Plaintiffs must allege that: (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was a factor motivating the deprivation. *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006). If Plaintiffs make this threshold showing, then the burden shifts to Defendants to show that retaliation was not the but-for cause of the adverse action. *Id.* at 717. If Defendants succeed on this point, the burden once again shifts back to Plaintiffs to demonstrate that Defendants' reason for the adverse action is pretextual. *Id.* at 717.

### 1. First Amendment Retaliation Claim: Brust and Watts

According to Brust and Watts, the 2014 budget adversely affects them because the decrease in the funds will result in their termination. Compl. ¶¶ 57, 69. But it is entirely unclear whether this is the case. In fact, as Ditton admits, he alone has the statutory authority and the funds under the 2014 budget to maintain Brust's and Watts' positions, so long as he eliminates

others.  Ditton Dep. at 72; *see* 35 Ill. Comp. Stat. 200/2-65; 60 Ill. Comp. Stat 1/500(a).  And the Board concedes that it has no authority to dictate to Ditton whom he should fire or hire in the Assessor's Office.  Larson Aff. at 5.

For their part, Plaintiffs offer little evidence in support of their argument that the Board specifically targeted Brust and Watts when passing the 2014 budget.  First, Plaintiffs claim that the evidence is clear that Brust and Watts engaged in political activity in support of Assessor Ditton and against some of the Defendant Trustees.  Dkt. 11 at 3-4.  But that alone is not enough.  In Plaintiffs' reply, they also state that the budget cuts were "targeted at Plaintiffs Brust and Watts, as evidenced by the document provided to Assessor Ditton by the Board outlining options that would adversely impact the employment of Plaintiffs Brust and Watts." Dkt. 19 at 15.  This document, however, only details *options* for various courses of action Ditton could take in order to address the salary cuts to his office. Perhaps Plaintiffs will uncover facts to support these "targeted" allegations during the course of discovery, but the preliminary injunction record does not support this claim. Therefore, Brust and Watts have not demonstrated a likelihood of success on the merits of their First Amendment claim.

## 2. First Amendment Retaliation Claim: Ditton

Based on the present record, Ditton's First Amendment retaliation claim also is not likely to succeed on the merits, but for different reasons.  Assuming, *arguendo*, that Ditton could establish a *prima facie* case of First Amendment retaliation, Defendants have offered evidence that the budget cuts were caused by financial concerns, and that political retaliation was not the but-for cause of the funding reduction.  In turn, Ditton fails to demonstrate that Defendants' reasons are pretextual.

Defendants have offered evidence that the funding reductions in the 2014 budget were prompted by concerns over the Township's financial condition. Dkt. 25, Defs.' Supp. Resp., Larson Aff. at 3-4, Rusch Aff. at 2-4. In response, Ditton claims that the Township maintains reserves in excess of $900,000 and, as of April 2014, there had been an increase in actual tax revenue. Dkt. 11 at 9. As to the reserves, however, Ditton ignores the evidence presented by Defendants that the Township was operating with a deficit under the prior administration's budget and that the present Township Board had to draw $161,000.00 from reserves. Defs.' Resp. to Mot. for Prelim. Inj., Ex. 2, McArtin Dep. at 90, Dkt. 25, Defs.' Supp. Resp., Larson Aff. at 3. As a result, Defendants implemented significant, across-the-board budget cuts that impacted numerous aspects of the Township's operations, not simply the Assessor's Office. *Id.* Defendants believed that continuing to dip into the Township's reserves without cutting its budget was untenable and unsound. Dkt. 25, Defs.' Supp. Resp., Rusch Aff. at 4. Additionally, according to Defendants, there was a decline in expected property tax revenue. *Id.*, Larson Aff. at 3. According to Larson, once everything was taken into account, the anticipated revenue of $665,000, which formed the basis of the Board's initial budgeting process, was actually $561,000. *Id.*

Because Defendants have offered evidence in support of their position that political retaliation was not the but-for cause of the budget cuts, the burden shifts back to Ditton to show that the reasons relied upon by Defendants are pretextual. *Wade v. Bravi*, 405 F. Supp. 2d 922, 927 (N.D. Ill. 2005). "A plaintiff can establish pretext either directly, with evidence suggesting that retaliation was the most likely motive . . . , or indirectly, by showing that the [defendants'] proffered reason was not worthy of belief." *Worth v. Tyer*, 276 F.3d 249, 265-66 (7th Cir. 2001). Here, Ditton falls well short of this hurdle. He has offered no evidence to suggest political

retaliation was the most likely motive for the budget cuts or that Defendants' concern for the Township's financial condition is not worthy of belief. In fact, not only did Defendants provide evidence supporting their financial concerns, but even after the tentative budget was adopted, Ditton was given two months to provide the Board with additional information to justify his requested funding. Defs.' Resp. to Mot. for Prelim. Inj., Ex. 2, McArtin Dep. at 90 and 119; Ex. 1, Ditton Dep. at 70-71. Ditton, however, did not respond. Dkt. 25, Defs.' Supp. Resp., DeLaMar Aff. at 3-4; Larson Aff. at 6-7. Because Ditton has failed to establish that the Board's rationale for the 2014 budget was pretextual, he has failed to show a likelihood of success as to his First Amendment retaliation claim.

## B.    Ditton's Due Process Claim

To state a procedural due process claim, Ditton must have been deprived of a protected life, liberty, or property interest without due process.[5] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Property interests in the employment context are created in one of two ways: "(1) by an independent source such as a state law securing certain benefits; or (2) by a clearly implied promise of continued employment." *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010). In *Palka*, the Seventh Circuit explained, "Due-process claims in the context of public employment require an entitlement to continued employment; more specifically, the plaintiff must have 'a legitimate claim of entitlement not to lose a valuable governmental benefit except for cause.'" *Id.* (internal citations omitted). Moreover, where an individual is deemed to hold a

---

[5]    To the extent that Ditton intends to pursue a substantive due process claim (which is not at all clear from his pleadings), such a claim would fail. "Where a particular Amendment [here, the First Amendment] provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (internal quotation marks omitted). Moreover, as the Seventh Circuit held in *Palka*, a substantive due process claim "is limited to violations of fundamental rights, and employment-related rights are not fundamental." 623 F.3d at 453.

property interest protected by the Due Process Clause, the question becomes what process is due. *Loudermill*, 470 U.S. at 541.

Here, Ditton alleges that by not approving his proposed budget, Defendants interfered with his ability to perform his duties as Assessor. Therefore, Ditton must show that: (1) he has a protected property interest in his ability to do his job; and (2) he was deprived of said interest without due process of law. *Krieg v. Seybold*, 481 F.3d 512, 519 (7th Cir. 2007).

### 1. Property Interest

To begin, it is unclear whether Ditton, as an elected official, has a cognizable property interest in his position. *See Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) ("Accordingly, we follow the [Supreme] Court's pronouncements on this issue, and are bound to conclude that [plaintiff] lacks a constitutionally cognizable property interest in her employment as an elected official."). Assuming that Ditton does have a cognizable property interest in his position as an elected official, a property interest exists "when an employer's discretion is clearly limited so that the employee cannot be denied employment unless specific conditions are met." *Buttitta v. City of Chi.*, 9 F.3d 1198, 1202 (7th Cir. 1993) (internal quotation marks and citation omitted). A property interest does not exist when an individual has no more than an "abstract need" or "unilateral expectation" of a benefit. *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

Here, rather than alleging a loss of employment, Ditton cites to four statutes that he believes create constitutionally protected property interests: 35 Ill. Comp. Stat. 200/2-65; 35 Ill. Comp. Stat. 200/2-80; 60 Ill. Comp. Stat. 1/500(a); and 35 Ill. Comp. Stat. 200/2-30. In particular, Ditton argues that these four statutes, taken together, compel the Township Board to

adopt whatever "necessary and reasonable" budget Ditton proposes. But this argument cannot withstand scrutiny.

35 Ill. Comp. Stat. 200/2-30 sets forth the procedural requirements for enacting the Assessor's Office budget, namely that the Assessor shall present a proposed budget sixty days prior to each fiscal year, the Township Board of Trustees "shall adopt a budget and appropriate ordinance in accordance with the Illinois Municipal Budget Law," and the Board "shall determine the amount required and permitted by law to finance the operations of the office of the multi-township or township assessor." This statute merely lays out a set of procedures the Board is to take to determine and approve a final budget. It does not create a property interest. *See Heck v. City of Freeport*, 985 F.2d 305, 311 (7th Cir. 1993) ("Mere procedural rights . . . do not of themselves give rise to property interests protected under the Fourteenth Amendment."); *Ferkel v. Bd. of Educ. of Chi.*, No. 11 C 09322, 2014 WL 2209004, at *4 (N.D. Ill. May 28, 2014) ("But the Reassignment Policy falls short for a more fundamental reason: it only lays out a set of notice, removal, and reassignment procedures; it does not establish a property interest that those procedures are designed to protect.").

The next two statutes, 35 Ill. Comp. Stat. 200/2-65 and 60 Ill. Comp. Stat 1/500(a), provide that the Assessor may appoint one or more suitable persons to assist in the operation of his office and that the Township Board may not employ and fix the compensation of employees of the Office of the Assessor. Neither of these statutes creates a property interest. When these two statutes are read in conjunction with Section 2-30, as well as 60 Ill. Comp. Stat. 1/80-60, which provides that "[t]he township board at the public hearing may adopt all or part of the tentative budget and appropriation ordinance, as the township board deems necessary," they merely set in place a system of checks and balances within the Township government for the

proper equipping and managing of the Assessor's Office. Therefore, while Ditton may be entitled to choose how to spend the funds allotted to the Assessor's Office, it is the Township Board that ultimately determines the amount of funds.

The only statute cited by Ditton that could potentially create a property interest is 35 Ill. Comp. Stat. 200/2-80. Section 200/2-80 provides, in relevant part, that "[t]he board of town trustees shall provide the office and storage space, equipment, office supplies, deputies and clerical and stenographic personnel and other items *as are necessary for the efficient operation of the office*." (Emphasis added.) By its terms, this statute requires the Board to provide sufficient funding "necessary for the efficient operation" of the Assessor's Office, thereby limiting the Board's ability to unilaterally slash funding to an unreasonable degree. But, when Section 200/2-80 is read in conjunction with 35 Ill. Comp. Stat. 200/2-30 and 60 Ill. Comp. Stat. 1/80-60, it is clear that the authority to make this determination of necessity rests with the Board (with the input of the Assessor), and Plaintiffs have provided scant evidence that the Board's determination was a guise for retaliatory action or was otherwise irrational or unreasonable. *See*, *e.g.*, *Cassens Transp. Co. v. Industrial Comm'n*, 844 N.E.2d 414, 419 (Ill. 2006) (under Illinois law, statutes must be read "as a whole . . . considering all the relevant parts."); *see also Ill. Dep't of Healthcare & Family Servs. v. Warner*, 882 N.E.2d 557, 560 (Ill. 2008) (same).[6]

Finally, Ditton does not present any authority for his position that a person can have a property interest in his or her ability to do their job in a certain manner. And, the cases in which courts have found a property interest in the employment context involved, at a minimum,

---

[6]  For these same reasons, Ditton's argument that the Board is statutorily bound to approve whatever "necessary and reasonable budget" that he requests is unpersuasive.

terminations, lay-offs, and allegations of constructive discharge, and thus are readily distinguishable.[7]

### 2. Notice and Opportunity to be Heard

All of this is of no moment, however, because even assuming *arguendo* that Ditton had a protected property interest in his ability to do his job, his claim still fails because he received the requisite procedural due process. An essential requirement of due process is "notice and opportunity for hearing appropriate to the nature of the case." *Loudermill*, 470 U.S. at 542 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Under the test set out in *Loudermill*, the Board was only required to provide Ditton with oral or written notice of its intended actions, an explanation of why said actions are necessary evidence, and an opportunity for him to respond. *See id.* at 546. All of these requirements were satisfied here.

Ditton was told in advance of the content of the tentative budget that would be discussed at the March 10 meeting. Dkt. 25, Defs.' Supp. Resp., Larson Aff. at 4, Rusch Aff. at 3. Ditton attended the March 10 meeting and presented his objections to the proposed budget, which was preliminarily adopted that evening. Larson Aff. at 6, Rusch Aff. at 4. Ditton was given notice of the March 10 hearing, and was provided with a notice of and an opportunity to be heard at the May 12 hearing. Larson Aff. at 6-7. Ditton then was provided additional time to present more

---

[7] Although Ditton suggests that the conditions created by the 2014 budget would lead him to resign, such bare assertions are insufficient to establish constructive discharge, which occurs where "working conditions were made so miserable that [plaintiff was] forced to quit." *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984) (citations omitted). *See Iovinelli v. Pritchett*, No. 06 C 6404, 2008 WL 2705446, at *19 (N.D. Ill. July 9, 2008) (dismissing the plaintiff's due process claim after finding that the duties and responsibilities that were removed from the plaintiff's oversight were not specifically assigned but rather discretionary and thus no property interest existed); *Ullchny v. Menton Cmty. Sch. Dist.*, 93 F. Supp. 2d 1011, 1028 (E.D. Wis. 2000) (disagreeing with the plaintiff principal's claim that "she had a property interest in performing all of the duties normally expected of a school principal in Wisconsin"); *Terry v. Woods*, 803 F. Supp. 1519, 1524 (E.D. Wis. 1992) ("The plaintiff principal may have reasonably expected that he would be able to do his work, but an expectation by itself does not create a property interest.").

information to support his proposed budget. Larson Aff. at 6. Therefore, based upon the present record, the Court finds that Ditton received sufficient procedural due process.[8]

### C.    Legislative Immunity

Lastly, the Individual Defendants argue that they are immune from Section 1983 liability under the doctrine of legislative immunity. *Rateree v. Rockett*, 852 F.2d 946, 949 (7th Cir. 1988); *see Kelly v. Chambers*, No. 07 C 1005, 2007 WL 4293633, at *7 (N.D. Ill. Dec. 6, 2007) ("Individual defendants are entitled to absolute immunity from § 1983 claims when they act in an area where legislators have traditionally had the power to act."). The Court agrees that Plaintiffs' claims also would be unlikely to succeed as to these Defendants in the face of this defense.

The Individual Defendants' immunity defense turns on whether they were engaged in "legislative" or "administrative" activity in proposing, voting for, and enacting the budget in question. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. The privilege of absolute immunity 'would be of little value if legislators could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) (internal brackets omitted)).

---

[8]    Ditton's declaratory action claim based upon Illinois statutes and the Illinois Constitution suffers a similar fate. First, as discussed above, the Board has the authority to adopt the budget for the Assessor's Office and the record is insufficient to establish that the Board's determination of the budget based on fiscal concerns and the perceived need of the Assessor's Office was pretextual or unreasonable. Second, the budget would not "eliminate or reduce the funds necessary to continue Assessor Ditton's benefits," because Ditton has the discretion to use the allotted funds to continue his benefits at the same or similar level by opting to reduce his expenses in other areas. Ditton Dep. at 72; *see* 35 Ill. Comp. Stat. 200/2-65; 60 Ill. Comp. Stat 1/500(a).

In *Benedix v. Village of Hanover Park*, the Seventh Circuit held that "an ordinance adopted through the legislative process, and have the force of law, is covered by legislative immunity no matter the motives of who proposed, voted for, or otherwise supported the proposal." 677 F.3d 317, 318 (7th Cir. 2012). Applying these principles to this case, legislative immunity attaches to the Individual Defendants' involvement in the proposal and eventual adoption of the budget. *See Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011) (finding that "legislative immunity attached to a county executive's role of transmitting a budget from the department of public works to the county board, which enacted the budget").

For these reasons, having considered and weighed all of the facts in the current record, the Court finds that Brust and Watts have not demonstrated a likelihood of success with respect to their First Amendment retaliation claims. The Court likewise finds that Ditton has not demonstrated a likelihood of success as to his First Amendment retaliation and due process claims.

## III.    Balancing of the Harms

In the balancing phase, Plaintiffs must demonstrate that the harm they will suffer without an injunction outweighs any harm that may be suffered by Defendants or third-parties (the "public interest") if the injunction is granted. *See Girl Scouts*, 549 F.3d at 1085-86.; *Ty*, 237 F.3d at 895. In conducting this analysis, the Court uses a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor." *Girl Scouts*, 549 F.3d at 1086. Here, because the Court already has concluded that Plaintiffs have not met their burden of demonstrating the threshold requirements for preliminary injunctive relief, it need not reach this final phase of the analysis. *See Ty, Inc.*, 237 F.3d at 895 (emphasis added) ("*If the court is*

satisfied that these three conditions [likelihood of success, no adequate remedy at law, irreparable harm] have been met, *then* it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.").

### Conclusion

For the reasons set forth above, Plaintiffs Chris Ditton, Cynthia L. Brust, and Richard M. Watts' Motion for Preliminary Injunction [11] is denied.


**SO ORDERED**                    **ENTER:  9/9/14**

_____
**JOHN Z. LEE**
**U.S. District Judge**